We'll move on to the fourth case of the day, Lisle v. Welborn and others, Appeal No. 18-1595. And we'll hear first from Mr. Kim. Am I pronouncing that correctly? Torchum. Torchum, sorry. Okay. May it please the Court, my name is Kamaile Torchum and I represent Appellant Stephen Lisle. Mr. Lisle was placed in disciplinary segregation as punishment for a contraband found in his cell. After several weeks in segregation, he attempted suicide three times. We have appealed the District Court's grant of summary judgment as to several claims related to these events, and today I'd like to start with the due process and the Eighth Amendment claims. Starting with due process. Mr. Lisle's confinement in segregation was an atypical and significant hardship on him that gave rise to a liberty interest, and the process that he was afforded before being placed there was constitutionally insufficient. Now, the District Court found that he had no liberty interest, but that conclusion was based on an incomplete analysis of the facts. The District Court focused on the physical aspects of confinement, including the focus on the rust and ventilation, whether Mr. Lisle had access to soap, and the condition of the toilet. Would you agree that on the physical aspects of confinement, there was not any comparative evidence of what the cell was like in the confinement versus what his cell had been like in general population? There was no evidence comparing the physical aspects beyond Mr. Lisle's testimony where he asserted that it was more severe, but our position is that Sandin requires a more holistic analysis. You look at the time spent in segregation in addition to all of the conditions, and here the District Court should have considered that in addition to the physical aspects, when placed in segregation, Mr. Lisle lost access to communicating with his family, he lost visitation rights, and he also testified in his deposition that he lost access to a crisis team, which worsened his already pre-existing psychological condition. Was that a policy of segregation, or was that a failure in his case? We do not have in the record what the official policy is in terms of how quickly you get access to a crisis team. Mr. Lisle's testimony is that had he been in the general population cell, he would have received a crisis team sooner. And Jason Holman, who was his cellmate while in segregation, also testified in his own affidavit that Mr. Lisle had been requesting access to mental health and a crisis team and did not receive it. Let me ask you another question about this liberty interest. Does Meacham require you to introduce evidence about other prisons in the state, the most restrictive situation in the state that he could have been put? It requires that the condition of the cell be compared to the ordinary incidence of prison life. And in this case, Menard is already a high maximum security prison. And in this case, what we have is Mr. Lisle's testimony that he did not receive the type of care he would have received had he been in general population. And that's significant here because, as I mentioned earlier, he was already on medication for having a mental health issue that needed treatment. So is your position that Menard is already the most restrictive prison that he could have been put in? I don't have enough information about comparing him to every other prison in the state, Your Honor, but I don't believe there's a question as to whether there's some other even more restrictive prison. So Meacham doesn't require that? No, Your Honor. Here, as I mentioned, the prison guards already knew that he was a psychologically vulnerable inmate. And, of course, now we know that he did, in fact, attempt suicide three times. And there is, in Sandin, room to take into account the case-specific facts that are before you. What's the evidence that the officers knew he had mental health issues before he went in? He was already on mental health prescription medication, Your Honor. Is there any evidence that the officers knew that? Certainly the health facility would have, but is there any evidence that the officers who were defendants here knew that? Because I don't think you can impute the knowledge from the mental health care to all of the officers in the prison without more. There's not information in the record, Your Honor, about whether Brookman specifically knew he was already on medication. Nevertheless, under Sandin, you are able to take a look at what actually happened over the course of his time in segregation. That's really the point of the time element. But if you're trying to decide at the outset what procedures are required, the officers have to make a determination about whether a liberty interest is implicated, right? Correct. So how can post-hearing or post-decision events undermine their decision from the outset? And after the fact analysis, Your Honor, is sort of implicit in the Sandin analysis, and I would point you to the fact that time spent in segregation is a significant part of that analysis, and they often don't know how long you're going to be in. Many times, particularly under administrative segregation situations, they come up for review periodically, and they might end up spending 240 months, for example, in segregation when they hadn't necessarily known it would take that long to begin with. So there is some element of hindsight in this that I acknowledge, but that's part of the liberty analysis. It's unavoidable. If that's the case, though, what do you do as an officer with a qualified immunity defense? You say, we're going to send this guy to administrative segregation for three months. We've got case law we know about. Maybe it's a little fictional in terms of their knowledge of it, but case law indicates that that doesn't really implicate enough of a liberty interest to trigger the full procedural requirements. Well, first of all, Your Honor, our position is that there's no qualified immunity defense raised here, but more to your question. The question is whether, not that he would prevail, but whether he was entitled to go to a jury. And we believe that with the facts that are here, including the physical conditions, in addition to the reality of how his loss of access to his support system and his family, this was in his testimony, made his mental health worse and eventually led to him attempting suicide on three occasions. And because his confinement in segregation was punitive, both controls here, and he is presumed to be able to bring his witness to his hearing unless there was some particular safety or penological interest that counsels against it, and that was just simply not the case here. That's the right rule because when the sole purpose is punishment, the law recognizes that we need more robust procedural protections to make sure that that punishment is meted out fairly. And so we would ask that this court reverse the grant of summary judgment on this point. Could I ask you to address the Batson issue? Yes, Your Honor. With respect to a defendant's south. I will just say I agree with you that the challenge was not untimely. But then the district judge went through the process of making a record, and non-racial reasons were stated. Is there any indication that these were not credible, or what could the plaintiff have argued here to argue that this was ultimately prejudicial to him? Two points to that, Your Honor. First, our position is that the court did not actually evaluate the facts on the record. It sort of accepted the fact that the defense counsel had offered what appeared to be. Right. There's no finding on credibility. I get that. Okay. But if it had gone the extra step further, what could plaintiff have said? Sure. So the two jurors or potential jurors that were at issue here were number 18 and number 23. And the defense counsel had argued that both revealed an inability to be fair, and they suggested that they would be biased. But both of them had explicitly responded no when asked if they would be biased. And so had the district court gone through the colloquy during the questioning process, they would have been able to identify that juror number 18 had said no when asked if she would be biased related to because of. . . Well, she said otherwise. She would have been disqualified for cause, right? So the question is, do counsel trust those answers from jurors, right? Mm-hmm. So are there comparators? Were there similarly situated white jurors who were not struck by the defense? The only comparator, Your Honor, would be juror number 15 who did end up on the jury. That juror was white and had a sister who had committed suicide. So there was a significant overlap in terms of the facts of this case, which is, of course, heavily about attempt of suicide. But not incarceration in that context? Not incarceration, Your Honor. But also, if I could just touch briefly on number 23, that juror had specifically said that he could be impartial because he understands that there are people who get good medical treatment, and that's on page 331 of the supplemental appendix. So there was certainly enough there for the judge to have gone through and discussed with defense counsel why exactly they thought they should be using their strikes on this point. Were there any white jurors who, during Bois D'Ir, said that they had relatives or friends who had been incarcerated and they had gone to the facility to visit them? Not that I'm aware of, Your Honor. If I may touch briefly on the Eighth Amendment issue, if there are no further questions on that. I have one question about the Batson issue. So the state defendants say, well, you know, these were Wexford's Batson. That was Wexford's Batson problem, and we didn't use our peremptory strikes on those jurors, so we shouldn't be held accountable for it now. It seems like a very odd situation because, you know, if he was prejudiced, you know, if they were racially struck, I mean, it does seem like he should have a new trial. The flip side is that's very prejudicial to the state. I mean, what if the state at that point had said, yeah, I agree with Mr. Lyle. I think these were, you know, racially charged peremptory strikes, and the district court had said, no, I disagree, and gone forward. Could you then on appeal still correct that error when the state had agreed with you? It just seems like a very odd... I understand your question, Your Honor. Under United States v. Rutledge, even one violation is a violation of Batson, even one use of a strike. And the issue is it goes to the sort of integrity of the trial as a whole. It's not just about which particular defense counsel made the particular racially motivated strike. Well, I agree, and you don't want collusion. You don't want them to team up and then later somebody say, oh, well, that wasn't mine, and just he's not a party on appeal, so it doesn't matter. But the flip side is then it does put the party who is innocent of the bias in kind of a quandary after the fact. That may be an inherent difficulty with having multiple defense counsel in a trial. I do think that had they had the discussion on the record to discuss whether or not these various potential jurors should be struck, they might have been able to work this out. There were, of course, additional veneer persons still waiting that might have been able to have been called, and so it could have been handled that way. Go to the Eighth Amendment. I'm going to give you a couple of extra minutes. I think we're going to be hearing from two counsel on the other side, and we've got several issues to explore, so go ahead. What's the remedy if the court, and I think we can all agree, the court did not make a credibility determination when ruling on the Batson challenges? What's the appropriate remedy? We've asked for a remand for the court to evaluate in the first instance. I can see that the court may decide that there was no violation here, but we think it's very important that the court actually go through those steps and make determinations on the record. If there is a violation, there would need to be a new trial. Moving to the Eighth Amendment matter, the district court erred as a matter of law when it held that verbal harassment cannot constitute deliberate indifference to suicide. Now, after Mr. Lyle's third suicide attempt, he was finally put on suicide watch, and at that point he was entrusted to the care of Nurse South. He alleges that while Nurse South was supposed to be providing medical treatment, she actively encouraged him to kill himself. According to Lyle, he said that she said she should have done it, quote, properly, and to, quote, go all the way through it. Did any of the evidence with respect to her alleged verbal statements come in at the underlying trial where she was a defendant for a deliberate indifference claim? If memory serves, Your Honor, I think they might have referenced them during trial, but they were not at issue during her trial. Did Mr. Lyle testify to that during trial? I don't believe so. I'd have to double check, but I don't think so. So we've got our Beal and Hughes cases that suggest this bright line does not exist. Nevertheless, I think our case law in this area does indicate some concern about opening floodgates. So if harsh words between prison staff and inmates bring them into federal court, we might see even more. So what standard would you propose? What jury instruction would be given to distinguish between what we've called simple verbal harassment and what you would say is actionable? Understood, Your Honor. What we're asking for here is actually fairly narrow. When there is a prison official that is an entrusted medical provider and that the inmate has been sent to that person for medical treatment, and that individual makes statements that put his specific psychological vulnerability at issue and targets the very reason he is there for treatment, that is a bright-line rule that I think is clearly different than the type of verbal banter or insults that the law understands does not rise to the level of an Eighth Amendment. What about if that individual goes on to give the inmate the care that he's required under the Eighth Amendment? Well, Your Honor, I suggest that the Eighth Amendment also requires that they not worsen a psychological vulnerability. He was not there for a broken arm or a sore wrist, so the fact that she took his physical blood pressure and things like that, he was there because of a mental... not a disability, but a mental harm that had led him to attempt suicide three times. So part of that would be being mindful and providing the care needed for his psychological reason that he was there. And under Zaya, this court discussed that providing some medical care is not enough. So she provided some medical care in the sense that she made sure he was still breathing, he was there in the room, but she also affirmatively, according to him in any case, actively made worse the very reason he was there to begin with. And we think that to the extent she denies having made those statements, our position is that that's simply a question of credibility and facts for the jury. And so we would ask that you reverse the grant of summary judgment there. Okay. Thank you. Thank you very much, counsel, and we'll plan on at least a couple of minutes of rebuttal. And we'll hear from the defense side first for Mr. Dozman. Is that right? May it please the court, I am Assistant Attorney General Aaron Dozman and I represent the state defendants. I will use 10 minutes to discuss the due process and equal protection claims while my co-appellee will discuss the other claims. Lyle's due process claim fails because on this record, Lyle did not establish with evidence that the conditions that he endured amounted to an atypical and significant hardship, nor did it establish that he was denied any process that he was owed. Whether he was constitutionally entitled to call a witness or not, the witness that he wanted to testify was interviewed by an Adjustment Committee member, thereby ensuring that that... How clear is the evidence on that? I thought Brookman said sometimes he's sure, other times he's guessing he probably did. It's summary judgment. Yes. I'll concede the deposition answers aren't a model of clarity. It's not a yes-no situation. He is on 179 and 180 of the Supplemental Appendix answering questions about what did he recall he said or the content of the conversation with Brookman, but he is sure that he did talk to Samuel. Lyle then, at his Adjustment Committee hearing, recalled that Brookman had told him that he had spoken with Samuel. So I think on both ends. But then Lyle also testified he thought Brookman was lying. No, he didn't testify that he thought he was lying. What Lyle said is he thought that Brookman was mistaken that he had actually spoken to Internal Affairs, but there's no reason why Lyle would know who Brookman knew he talked to. So while I think that's the fairest reading of the record is that Brookman did talk to Samuel, that evidence was presented to the Adjustment Committee. And you think that kind of informal conversation, kind of ex parte with one member would have satisfied? If he had the right to have a witness testify, you think that would have been enough? Yes, I think that satisfies Wolf, because Wolf doesn't contemplate that your witness is put in a box and then questioned by the inmate. It's just that you have evidence that you want put before the Adjustment Committee, and however it gets before the committee. One guy sees him in the hall, pulls him aside, chats with him for a minute. That's giving the evidence to a member of the committee who then goes back and shares it with the committee, and that would satisfy Wolf? On those facts, I suppose if they had a conversation about an event that happened, I don't see why that wouldn't satisfy Wolf, because I think what Lyle's contemplating is that he would hear the testimony in front of him live, and there's no right to confront or cross-examine witnesses during these hearings. Your position is he's not even entitled to know what Samuel said, right? Because there's a risk of putting another inmate at risk. In this case, especially so. Yeah, there's no way he could have controlled the witness testimony in any way. Samuel was going to testify to what he observed. There is this added problem of the abuse allegations by Thurman, who is Lyle's roommate, against him. So if Samuel goes in front of the adjustment committee and gives a full story of what he knows, or what prison officials know, then that is revealing to Lyle that his roommate has snitched on him, and that is inconsistent with Wolf. Wolf says that the witness, the presentation of this testimonial evidence, needs to be consistent with penological justification, safety, and security. That is tantamount. And there's a high degree of deference built into that standard, too. So for those reasons, Wolf was satisfied in this case. As far as liberty interests, Lyle relies heavily on the suicide attempts while he was in segregation. And I think the fairest way to describe what's going on with the suicide attempts is that they're intervening facts. They're intervening claims, intervening actors who are being deliberately indifferent. And their deliberate indifference doesn't then make disciplinary segregation an atypical and significant hardship condition. What it is is you have intervening actors who were being deliberately indifferent. And those went to trial, and liability was found on those claims. So it can't be bootstrapped into the liberty analysis for the liberty interest. And so far as the equal protection claim goes, there is no evidence of either Samuel or Brookman's intent, any discriminatory intent. And I think what Lyle's trying to do is collapse the similarly situated prong into creating a question that the jury might answer that, oh, because they were treated differently, and they're both of different races, therefore the jury could speculate that race played a factor. But that is not enough for summary judgment on the claim. So while our brief does provide a lot of extra context around why these actors might have done what they'd done, the claim really fails because there is no evidence, no facts of these individuals' intent in the record, and that they did anything for any race-based reason. But it can be circumstantial, right? And what about the evidence that there were the black cellmates who were then both put in segregation when contraband was found? Yes, the intent prong is a famously difficult prong and is often proved by circumstantial evidence. But I don't think that those individuals are relevant to this analysis because there's more information. It's not just these three individuals versus one in a vacuum. It's that there's a separate situation with Thurman who during this whole ordeal is alleging that he's been abused by his cellmate, and that's really why the analysis is really limited to Lyle and Thurman. And I don't think that Holman and his roommate really offer anything in the analysis to create a pattern or anything of these individuals' discriminatory motive. If the Court has no further questions, I will yield my time to my co-advocate. Thank you. Thank you very much, Mr. Dozman. Thank you, Mr. Holting for Nurse South. Good morning, Your Honors. Dan Holting on behalf of Nurse South. I just want to clarify something before beginning. Your Honor, I'd ask a question related to the Batson. If there were any similarly situated veneermen that were not African American that had close ties to somebody in prison. Counsel had said no, she did not know. Veneerman 9 was not an African American. His nephew moved in to live with him after he got out of prison. He was struck all the same through a peremptory strike. As to the deliberate indifference, Nurse South was not deliberately indifferent to Mr. Lyle's medical condition. As this Court held previously in DeWalt v. Carter, standing alone with simple verbal harassment does not constitute cruel and unusual punishment. Assuming Nurse South made these statements alleged by Mr. Lyle. Which we do. Of course. Mr. Lyle had no opportunity to harm himself. Prior to Nurse South's involvement, Dr. Larson placed Mr. Lyle on suicide watch in a strip cell. He received observation every 10 minutes, a vitals examination every 2 hours, and a neurological examination every 4 hours. Does that preclude finding that this would be cruel and unusual? Even if she knew that she couldn't actually drive him to successfully killing himself because he was under surveillance, wouldn't the psychological torture still be enough? Under these facts, no, we would argue, Your Honor. For deliberate indifference, for cruel and unusual punishment, in a suicide setting, a prison official must know of a substantial risk of suicide and intentionally disregard it. I thought here we're talking about aggravating risk. Right. Inflicting psychological harm. Yes. There needs to be an excessive risk of harm to the inmate's health. Here, there was no risk of harm because Mr. Lyle did not have the opportunity to harm himself. Well, there's no risk, perhaps, that he would actually be driven to suicide by what she said because he would have been unable to complete the task and the circumstances in which he found himself. But does that, as a matter of law, preclude our saying that this was cruel and unusual for her to taunt someone who she knew was suicidal and would then experience anguish as a result of having her say what she said? Under that hypothetical, I think it's a more colorable claim. I think there's also evidence in this case based on Mr. Lyle's deposition testimony that her statements did not cause him any mental anguish. During his deposition, after Mr. Lyle explained the comments allegedly made by Nurse South, he did not say that it caused him to suffer severe psychological harm, as was the case in Beal or Hughes. He did not seek additional mental treatment. He only said that they were, quote, unprofessional. He thought it was unprofessional that Nurse South made the comments. He never said that... What was he asked? First, he was asked what she said. Then he explained that she allegedly said that you should do a better job next time, et cetera. Then they said, what happened after? How did it make you feel? He said, I just thought it was unprofessional. Essentially, she doesn't know who I am. Was his testimony, in essence, was his memory, was his testimony exhausted by the questions? Yes. I'm sorry. Well, I can imagine somebody... We see witnesses a lot of times who initially will give a minimal or limited response, but if you press, there will be more. He went on. There were multiple paragraphs in the deposition testimony explaining this. Did he deny at any point that her statements had a mental impact on him? I don't believe he was asked. However, the record also shows that there were no future attempts at any harm, no self-mutilation or suicide attempts following his encounters with Nurse South. Does the record say anything about whether he sought any kind of psychological counseling after the comments? The only psychological counseling he received, he did not request any himself. The only psychological counseling he received was actually because of Nurse South. Following her September 6th evaluation of Mr. Lyle, she checked his vital examinations, his neurological examination, but she also made a call to a non-party mental health physician and on her own initiative asked that a mental health examination be performed by a mental health professional. So later he was seen by one, and it was because Nurse South had requested said evaluation. Moving on to the Batson, as I see my time is running out. I'll take a couple of extra minutes at least. Okay. Mr. Lyle's brief suggests that the comments made by Nurse South were increase his risk of suicide, as we've discussed. He had no risk of suicide because of the precautions taken. I've got to tell you, I'm taking that with a huge grain of salt because of the number of cases of successful suicides that we see for prisoners who were supposedly on suicide watch. I agree, Your Honor. Not necessarily at Menard, but from enough different correctional facilities within this circuit that I would not say the risk is zero. It didn't happen here, fortunately. Yes, Your Honor. And on top of that, for his prior suicide attempts, Mr. Lyle had attempted hanging by using his bed sheets or his blankets. The record is not totally clear on that. When he was placed in the cell, Mr. Lyle was stripped and he was given a suicide blanket. Those were the only objects he had in his cell. He had no means to harm himself. You're more confident than I am. Moving on from this, there's nothing in the record that suggests that any of the actions of Nurse South put Mr. Lyle at an excessive risk of suicide. Therefore, this court should affirm summary judgment in favor of Nurse South on Mr. Lyle's claim of verbal harassment. Moving on to Batson, this court should affirm the district court's determination that Nurse South had race-neutral reasons for exercising her peremptory challenges. There were at least 27 veneer men in the jury pool, five of which were African Americans. So is there any way that this was an untimely challenge? I don't see how it could have been. There's some case law that states that contemporaneous objection to a Batson Is there any case law that suggests a Batson challenge is untimely if it's made before the jury is actually seated and the rest of the panel is released? Not to my knowledge, Your Honor. And you'd agree that a party bringing a Batson challenge often has to wait and see how all of its challenges have been used before they know whether there's a basis for even raising it? Yes and no, Your Honor. I think if there was a pattern argument made, yes. But as counsel pointed out, one strike of a protected class can constitute a Batson objection. Do you think we should follow a different rule for timeliness depending on whether somebody argues pattern or one at a time? No, Your Honor. Neither do I. As I was saying, there were five African Americans in the jury pool. Counsel for Nurse South used his peremptories on Vannierman 9, 18, and 23. The through line between all three of these jurors was that they said they had close personal ties with persons in jail. Two of the three strikes on Vannierman 18 and 23 were on African American jurors, Vannierman. However, as I pointed out earlier, Vannierman number 9 was not an African American and he was stricken all the same. Vannierman 23 even went as far as to state that his thoughts on the health care provided to inmates was most definitely negative based on a situation involving his sister when she was incarcerated. Further, the first accepted juror by all of the parties was an African American, was Vannierman number 10. The party still had peremptory strikes remaining at this time and chose to accept Mr. Vannierman 10 because he did not have the close personal ties to someone in prison like Vannierman 9, 18, and 23. Would you agree that the court did not make credibility determinations on the Batson challenges? I would not, Your Honor. How can we read from the transcript that the court made a credibility determination? In the transcript, reading the language from counsel and Judge Reagan, if I could point you, Your Honor, to the case United States v. McMath, this court found that there was not a determination on the record because in response to a Batson challenge, the judge simply said, challenge denied. Here, the explicit language of Judge Reagan at the district court was that, I find that to be a race-neutral reason. Well, it was. That's right. And the next step is, and I believe it, which he didn't take. Well, the depth of his analysis only goes so far as the plaintiff's counsel's analysis. We also argue, and I can move on to that as well, that the plaintiff's counsel did not establish a prima facie case of discrimination necessary for Batson. In order to properly raise a Batson challenge, you need to show that a juror or a Vannierman was stricken because of their race. This court has previously said that simply pointing to the fact that counsel excluded an African-American from the jury pool is not enough. When objecting, all plaintiff's counsel said was, for the record, I would like to point out that Wexford counsel used two of its three preemptory strikes on African-Americans. I think these are for racially-based reasons. Simply saying these are for racially-based reasons is not enough. Counsel must point to facts and circumstances that raise an inference that race played a role, and it was because of race. But he wasn't asked to explain it any further because the judge told him it was untimely, right? In essence, we've got things kind of short-circuited both ways here. And the court understood it as a Batson challenge? Yes. The court understood that's what counsel was raising?  But there's still no evidence that he made the proper prima facie case. Does he still have to, under McGrath and the Supreme Court's opinion, in Hernandez? Don't you skip that first step if the court goes on to address the Batson challenge? I do not believe so, Your Honor. But I couldn't tell you for sure on that issue. There's still no evidence on the record that the jurors were stricken because of their race. All counsel pointed to was the fact that they were African-American. He did not point to similarly situated jurors. He did not point to a pattern. There's no evidence that Vannierman 1823, in fact, Vannierman 23, had explicitly stated that he had most definitely negative opinions on the health care inmates received. And he said that he had, I believe, six siblings who were incarcerated. He visited them as much as he could. I believe for some of them, depending on their location, he went as often as possible. He talked to them about their environments. The same as of 18, she visited her father's friends in prison. She talked to them while she visited them and understood their situation. And then Vannierman 9, who was not African-American, took in his nephew after he got out of prison. And he lived with him for a number of years, I believe. Okay. I think you need to wrap up. Yeah. For these reasons, we ask that this court affirm summary judgment in favor of North-South on Appellant's verbal harassment claim and affirm the district court's denial of Appellant's bashing objection. Thank you. Ms. Turchin, rebuttal. And since I've been a little loose on the clock on this one, let's say up to four minutes if you need it. Thank you. Thank you, Your Honor. I thought I'd start quickly on the Batson point, unless you'd like me to start elsewhere. First, speaking to the Prima Fascia case, trial counsel did make a Prima Fascia case. What he actually stated, and I'll just read from the transcript here, is if I could make an objection for the record for Wexford's exercise of its peremptory strikes for racially motivated reasons and exercising two of the three peremptories on black jurors. I think that's clear that he's trying to establish a pattern there, and under Batson itself, pointing out a pattern of strikes is one way to make a Prima Fascia case. With respect to juror number 18, appellee counsel states in their brief that she had expressed doubt as to whether she could be neutral. Well, there's a question of fact there, because she also stated explicitly, no, I can be. I can be fair. And then, as I mentioned earlier, as to number 23, he did have a number of family members in prison, but he also stated very clearly, yes, I can be impartial because there are people who get good medical treatment. But I think the takeaway here is that all of this is why the district court should have gone through this, and it would be proper at this point to remand for the district court to do that in the first instance. Counsel, can you address the deposition testimony of your client on the Eighth Amendment claim, on whether he was anguished, whether he just thought this was unprofessional? Yes, Your Honor. I think it's important to remember that this deposition testimony was taken a while later, and the fact that he described it as unprofessional, I think that's true characterization. He was not asked specifically whether her questions or her statements exacerbated his mental illness to the extent that he would be driven to cause suicide again. I mean, he was just not asked that very particular question. I think what is more relevant, and as stated in Eppley South's brief on page 10, he acknowledged during the time, while he was under South's care, that he continued to feel suicidal. So I think that is the more relevant testimony, and it's the timely testimony. I do want to go back to the idea that he did not, in fact, attempt suicide again. So of course, as Your Honor acknowledged, it can't be the case that someone has to successfully commit suicide  But I also think that there is not a particular time frame here where he needed to attempt suicide. If we take what he says as true, it certainly is possible, and the jury could make the inference, that as soon as he was in a situation where he was by himself and no longer under suicide watch, the things she said might have stuck in his mind and he might have tried again later. The point of an Eighth Amendment claim is that you're aggravating the risk of serious harm, not that serious harm actually ultimately happens. That's just not the point. And for example, if I make a more concrete hypothetical, if someone has a broken arm and there's extensive delay in treatment, the fact that that arm is eventually treated and may heal properly doesn't mean that they don't have an Eighth Amendment claim anymore. And so that's the situation that we have here. He ultimately did not attempt suicide again, but the anguish and the psychological harm constitutes an Eighth Amendment violation. Very quickly on the process question, I believe that Appellate Counsel is sort of overstating the standard in Wolf. I'm sorry, overstating the amount of discretion under Wolf. We agree that prison officials certainly have a certain amount of discretion when deciding how to run their hearings. But under Wolf, you're presumed a witness unless there's some particular reason not to have one. Mr. Lyle was not seeking to cross-examine. That's not what we're asking for. But as far as we can tell in the record, no one ever spoke to Samuel and he wasn't present. To the extent there might be inferences someone could make from the record that maybe Brookman spoke to Samuel offline out of the presence of even the second Adjustment Committee person, who they never say talk to Samuel, that's just an improper inference at the summary judgment stage. And I do think that to the extent there's a question about whether Brookman spoke to Samuel, that's directly contradicted in the record by the Adjustment Committee report, which specifically says no witness requested. Now under Illinois state regulations and under Wolf, the officials are required to state their reason in the final report. And here the final report says there was no witness requested at all. So it's not proper to assume that he spoke to Samuel under these circumstances. Thank you very much, counsel. Our thanks to all counsel. And Ms. Turchan, you and your law firm took this on at the court's request. Thank you very much for your service to both your client and the court.